CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
September 29, 2025
Laura A. Austin, Clerk
BY: /s/ K. Lokey
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| ALAELDIN ABDELBAKI, | CASE NO. 3:23-cv-00071 |
| *Plaintiff,* |  |
| v. | MEMORANDUM OPINION |
| RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, *et al.*, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Plaintiff Alaeldin Abdelbaki, a self-described "Arab/Middle Eastern man" of African descent who resides in Virginia, taught mathematics as an adjunct professor at the University of Virginia until his contract was not renewed. Dkt. 10 at 2. He alleges that the decision not to renew his contract was based on his race or national origin, and thus he brings the instant suit against the University of Virginia ("UVA") and various faculty members, alleging violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and the Equal Protection clause of the Fourteenth Amendment to the United States Constitution. *Id*. He seeks damages and specific injunctive relief. Dkt. 10 at 13.

Now before the Court are two motions: (i) Defendants' motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), Dkt. 22, and (ii) Abdelbaki's subsequent motion for leave to file a second amended complaint, Dkt. 30. The latter motion for leave to amend was referred to U.S. Magistrate Judge Joel C. Hoppe for a report and recommendation (R&R). Judge Hoppe recommends that leave to amend be denied, and Abdelbaki objects. Dkt. 35 (R&R); Dkt. 36 (Objections). As set forth below, the Court concludes

that Abdelbaki's objections to the R&R are overruled, the R&R is adopted, and Abdelbaki's

motion for leave to file is DENIED. The Court further concludes that Defendants' motion to

dismiss is DENIED as to Count I and GRANTED as to Counts II and III.

## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

Federal Rule of Civil Procedure 15(a) provides that a plaintiff may amend his complaint

once as a matter of course within a certain amount of time. Fed. R. Civ. P. 15(a)(1). "In all other

cases, a party may amend its pleading only with the opposing party's written consent or the

court's leave." Fed. R. Civ. P. 15(a)(2).  Rule 16(b)(4) additionally provides that where a motion

to amend would modify or contravene a court's scheduling order, leave to amend is granted only

for "good cause" and "with the judge's consent." Fed. R. Civ. P. 16(b)(4).

The court enjoys "substantial" discretion in applying each Rule's standard. *Moore v.

Equitrans, L.P.*, 818 F. App'x 212, 217–18 (4th Cir. 2020). Moreover, the court does not need to

apply Rule 15(a)(2) at all if the moving party "has not demonstrated good cause for [its] delay"

under Rule 16(b)(4). *Doe v. Sutton-Wallace*, 2019 WL 5088769, at *3 (W.D. Va. Oct. 10, 2019);

*Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 299 (4th Cir. 2008) ("Because we sustain the

District Court's application of Rule 16(b), there is no cause for us to address the Court's finding

that [the] amendment would be futile, which is a Rule 15(a) consideration.").

Here, both Rules 15(a)(2) and 16(b)(4) apply to Abdelbaki's motion for leave to amend.

Rule 15(a)(2) applies because Abdelbaki has already amended his complaint once as a matter of

course, *see* Dkt. 10, thus requiring him to seek leave of court for any additional amendment; and

Rule 16(b)(4) applies because his instant motion for leave to amend—filed on March 20, 2025—

comes well beyond the Court's July 1, 2024 deadline for motions to amend, as set forth in the

pre-trial scheduling order. *See* Dkt. 8, ¶ 24. Thus, to prevail on his motion to amend, Abdelbaki

must surmount both Rule 15(a)(2) and 16(b)(4).

Although each rule applies, the Court does not need to analyze Rule 15(a)(2) because Abdelbaki has not demonstrated good cause for his delay under Rule 16(b)(4). The Court's pre-trial order stated that motions to amend must be filed no later than July 1, 2024, "[e]xcept for good cause shown." Dkt. 8, ¶ 24. Yet when Abdelbaki filed his motion to amend well beyond this deadline, on March 20, 2025, he did not propose any "good cause" justification for the delay whatsoever. *See* Dkt. 30. A movant who "offer[s] no justification whatsoever" cannot show good cause. *See Southern v. Bishoff, 675 F. App'x* 239, 249 (4th Cir. 2017) (per curiam). Thus, it strains reason to consider Abdelbaki's motion viable.

The Magistrate Judge recommended denying Abdelbaki's motion to amend for this very reason. Dkt. 35  at 7 (stating that Abdelbaki offers "no justification whatsoever for his late amendment"). Abdelbaki objects to this conclusion, making three points, which we must review *de novo*.[1]

First, Abdelbaki argues that this Court's deadlines were "rendered non-binding" by the Court's May 28, 2024 order, which modified certain discovery deadlines according to a joint request of the parties. Dkt. 36 at 1 (citing Dkt. 14). However, that order of the Court expressly stated that all other deadlines in the original pre-trial order "remain[ed] in full force and effect," including deadlines for motions to amend the complaint. *See* Dkt. 14 at 1-2 (amending deadlines related to the parties' Rule 26(f) conference and Rule 26(a) disclosures). The Court's order only affected the discovery deadlines governed by Rule 26, per the express request of the parties. Dkt.

---

[1]    The district court conducts a *de novo* review of those portions of a magistrate judge's R&R to which the party made specific objections. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C); *Orpiano v. Johnson*, 687 F.2d 44, 48 (4th Cir. 1982). The Court may give a magistrate judge's R&R "such weight as its merit commands and the sound discretion of the judge warrants," *United States v. Raddatz*, 447 U.S. 667, 682–83 (1980) (internal quotations omitted). The district court may accept, reject, or modify the recommended disposition based on its de novo review of the recommendation and the objections made. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).

12 at 2 (joint motion of the parties stating that "[n]o other deadlines are changed from the current Scheduling Order"). Accordingly, Abdelbaki's first objection stating that the Court's minimal modification of the pre-trial order rendered all other deadlines "non-binding" is completely meritless and is overruled.

Second, Abdelbaki argues that the Court "functional[ly]" suspended the scheduling order and its deadlines when it cancelled the jury trial, in light of Defendants' pending motion to dismiss and Abdelbaki's anticipated motion for leave. Dkt. 36 at 2. He contends that the Scheduling Clerk's emails in regard to postponement of the jury trial indicated that the entire scheduling order was rendered "flexible," and that "[n]o new deadline for amendment was ever reissued." *Id.* However, the Scheduling Clerk's emails never referenced anything but postponement of the jury trial, and the Court's postponement of the jury trial had no effect on deadlines for *modifying the complaint* in this matter. Postponement of the jury trial simply reflected the fact that the prior-decided date for the jury trial would need to be adjusted, since dispositive motions remained pending. Accordingly, Abdelbaki's second objection has no merit and is overruled.

Third, he argues that he "acted with diligence once the scope of the issued raises in Defendants' motion to dismiss became clear." Dkt. 36 at 3. He states that Defendants filed their instant motion to dismiss on February 20, 2025, and he filed his motion to amend—in response to Defendants' arguments—just one month later, on March 20, 2025. *Id.* Indeed, he contends that leave of court would serve judicial economy, because it would facilitate adjudication of the case on the merits, rather than on technicalities. Dkt. 36 at 3-4 (citing *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) ("Rule 15(a) directs that leave to amend 'shall be freely given when justice so requires.' This liberal rule gives effect to the federal policy in favor of resolving cases on their

merits instead of disposing of them on technicalities.").

However, while the general policy in favor of rendering decisions of the merits is important, so too is a court's need to order its own affairs and proceed with litigation expeditiously. At bottom, Abdelbaki simply fails to provide a justification for his delay between the filing of his operative complaint in May 2024, and his instant motion to amend in March 2025. This suggests that he was not exercising "diligence" during this period and that, instead, he developed the need to amend his complaint only after Defendants filed their instant motion to dismiss in January 2025. To extent that is the case, *i.e.*, to the extent that Abdelbaki's motion to amend is directly responsive to Defendants' motion to dismiss, this may suggest that "justice so requires" leave to amend under Rule 15(a)(2), but it equally suggests that Abdelbaki's motion amounts to an end run around the Federal Rules' scheme of dispositive motions practice. Furthermore, the "justice so requires" standard of Rule 15(a) does not even apply here, because Abdelbaki has not first shown "good cause" for neglecting the Court's pretrial order under Rule 16(b)(4).

Indeed, many of Abdelbaki's proposed amendments were within the realm of his awareness long *before* Defendants filed their instant motion to dismiss. As the Magistrate Judge outlined, Abdelbaki seeks to make three changes to his Amended Complaint:

1. Split the § 1983 claim (Count III) "into two separate claims: (a) Defendants serving in their Official Capacity, by which injunctive relief may be granted . . . and (b) Defendants serving in their Individual Capacity, by which monetary damages may be granted."

2. "[A]dd two additional similarly situated comparators under his Title VII claims, totaling to four similarly situated employees who were treated more favorably than Plaintiff."

3. "[M]odify other areas, such as clarification of administrative exhaustion with the EEOC

so to not risk dismissal of his case due to minor or amendable technicalities."

Dkt. 30 at 2. Each of these proposed amendments relate to legal arguments raised not only in

Defendants' instant motion to dismiss, but also in Defendants' prior motion to dismiss, which

was dismissed as moot but was filed in April 2024. In other words, Abdelbaki was on notice of

potential deficiencies in his complaint in April 2024, nearly a year before he moved for leave to

amend.

For example, Defendants' initial motion to dismiss raised defenses of qualified immunity

and discussed the law regarding § 1983 claims brought against state actors in their individual

capacity, Dkt. 6 at 16, thereby putting Abdelbaki on notice that he may need to reconsider the

structure of his § 1983 claim (as he now seeks to do in his proposed amendment). Likewise,

Defendants' initial motion to dismiss argued that Abdelbaki failed to identify a similarly situated

comparator as required by Title VII case law, Dkt. 6 at 8, thus giving him nearly a years' notice

that he needed to allege sufficient comparators to prevail in his claims (as he now seeks to do by

amendment). Finally, Defendants' initial motion to dismiss raised questions of administrative

exhaustion and timeliness vis-à-vis the Equal Employment Opportunity Commission (EEOC),

Dkt. 6 at 5, putting Abdelbaki on notice of those requirements as well.[2]

In other words, Abdelbaki was on notice as of April 29, 2024, regarding the general

issues and potential deficiencies in his complaint which his current motion to amend seeks to

address. He amended once as a matter of course in May 2024, Dkt. 10, and then waited nearly a

year to request a second amendment. His instant motion to amend provides no good cause for

---

[2]    As the Magistrate Judge noted, Abdelbaki's proposed Second Amended Complaint does not actually make
any "modifications" related to the EEOC. The only two EEOC-related allegations in this proposed pleading are
identical to the only two EEOC-related allegations in his Amended Complaint. *Compare* Pl.'s Prop. 2d Am. Compl.
(Dkt. 30-2) ¶¶ 4–5, *with* Am. Compl. (Dkt. 10) ¶¶ 4–5. Both appear under the heading "Jurisdiction and Venue."
Dkt. 30-2 at 2; Dkt. 10 at 2.

this delay. Accordingly, leave to amend is denied under Rule 16(b)(4); the Magistrate Judge's

recommendation, Dkt. 35, is ADOPTED; and Abdelbaki's objections are OVERRULED.

This matter will proceed with Abdelbaki's first amended complaint, Dkt. 10, serving as

the operative complaint.

## **LEGAL STANDARD**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a

complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual

allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable

inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a

claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation

to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions,

and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at

555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true

unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. &*

*Loan Inv.*, *LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say

Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead

"only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible

claim for relief survives a motion to dismiss.").

## BACKGROUND

Abdelbaki is a Muslim, "Arab/Middle Eastern man" of African descent who resides in Virginia. Dkt. 10 ¶ 7. He was intermittently employed as a mathematics lecturer at UVA for several years, during which time he allegedly experienced race, religion, and national origin discrimination and retaliation. *Id.*

He started at UVA as an adjunct lecturer in August 2014, and he served in that role until May 2015. Dkt. 10 ¶ 12. He was then promoted and served as a full-time lecturer from August 2015 – May 2017. *Id.* ¶ 13. He "consistently yielded nearly perfect marks on course evaluations." *Id*. ¶ 13. The next semester, for reasons not explained in the complaint, he returned to his position as an adjunct lecturer, and then decided at the end of that term "to discontinue employment at UVA due to relocation." *Id.* ¶ 12.

Not until several years later did Abdelbaki reconsider employment at UVA. Around September 2021, he interviewed for an adjunct lecturer position for the 2022 spring semester. Dkt. 10 ¶ 14. Professor Mikhail Ershov conducted his interview and explained the hiring process to him, noting that his contract could not be renewed outside of the formal process because he had not taught at UVA for several years. *Id*. ¶ 15. Following the interview, UVA hired him as an adjunct lecturer for two math classes in the 2022 spring semester, beginning in January 2022. *Id.* ¶¶ 16, 18-19, 32.

Prior to the start of the spring semester, Abdelbaki contacted Jim Rolf to advise him that Abdelbaki would have to miss a teaching workshop due his child being severely ill. Dkt. 10 ¶ 17. Jim Rolf is a white male who served as director of lower-level courses in the mathematics department. *Id.* ¶ 10. Abdelbaki alleges that Rolf responded with an email "that may be best described as 'less than sympathetic.'" *Id.* ¶ 17. Although the two had never met or corresponded,

Abdelbaki alleges that Rolf surely "knew, at this point," that Abdelbaki's name was "associated with Muslims and individuals of Middle Eastern descent." Dkt. 10 ¶ 17.

In January or February 2022, after classes began, a student in Abdelbaki's Math 1140 class complained that he taught to fast to Rolf. *Id.* ¶ 18. Abdelbaki notes that he "had successfully taught Math 1140" at UVA several times in the past. *Id.* In response, Rolf came to observe Abdelbaki lecture in Math 1140—although Abdelbaki alleges he was "hardly attentive." *Id.* ¶ 19. Rolf spoke with Abdelbaki after class and asked him "what went wrong and what didn't go wrong?" *Id.* Abdelbaki responded that "everything went well, but that it would have been ideal to conduct collaborative groupwork," but for the time limitations of the class. *Id.*

Later on, Rolf met with Abdelbaki over Zoom to discuss his teaching performance, and Rolf concurred with the student that he "put information on the board pretty fast." Dkt. 10 ¶¶ 18-20. Abdelbaki stated that this was his first student complaint, to which Rolf said, "Well, now you got your first one." *Id.* ¶ 20. Following Rolf's feedback, Abdelbaki contacted Ershov, who had originally interviewed him in September 2021, and complained that Rolf had "mischaracterized his teaching as being too fast." *Id.* ¶ 22. Abdelbaki sent Ershov an audio recording of the lecture which Rolf had observed, and Ershov concluded that "the pace was fine." *Id.*

Later that semester, Abdelbaki alleges that he became the target of "increasingly intimidating behavior" by Evangelos Dimou, a white male who serves an assistant professor of mathematics. Dkt. 10 ¶ 11, 23. Abdelbaki characterizes Dimou's behavior as "microaggressions," being "ticked off," or otherwise "exhibiting his displeasure or annoyance with Abdelbaki." *Id.* ¶ 23. Abdelbaki alleges that he spoke with other members of the faculty regarding both Rolf and Dimou, and each "concurred" with his characterizations of their behavior. *Id.* ¶ 24.

Abdelbaki alleges that he "began to suffer from extreme depression and sadness" over the

9

course of the semester, due to Rolf and Dimou's treatment of him. Dkt. 10 ¶ 25. He contacted

Human Resources (HR) to request the possibility of taking leave, but they advised him that

adjunct faculty such as himself "cannot submit leave." *Id.* HR instead advised him to take up the

matter with his supervisor.

In March or April, he emailed Ken Ono to express his concerns. Dkt. 10 ¶ 28. Ono served as

chair of the mathematics department and is a Japanese-American male. *Id.* ¶ 9. In his email to

Ono, Abdelbaki stated that he felt "he was being harassed and mistreated by Rolf and Dimou,"

and that his mental health was deteriorating while working under their supervision. *Id.* ¶ 28. He

"requested that another instructor teach his two courses for the remaining month of the

semester," but he did not quit his post. *Id.*

At first, Ono "relieved [Abdelbaki] of his teaching responsibilities." Dkt. 10 ¶ 29. But he

later retracted this decision, after contacting the associate dean, Laura Galloway. *Id.* ¶¶ 29, 30.

Ono called Abdelbaki "on a Sunday morning" and was "infuriated with him." Id. ¶ 29. Ono

stated that he had "made a mistake by relieving Abdelbaki of his courses," and that he was being

"reprimanded for this." *Id.* ¶ 30. Ono allegedly told Abdelbaki that he had "created a mess," that

the issue "got all the way to the provost's office," and that the university had initiated an

investigation into Abdelbaki's incident with Rolf and the student who complained of his teaching

style. Id. Abdelbaki said, "I know Rolf is harassing me because I'm Muslim." *Id.* Ono replied,

"Any complaints should be made to HR." *Id.* ¶ 31. Ultimately, "an agreement was made"—

between whom, it is not clear—that Abdelbaki "could teach both his courses via Zoom, []

without any contact with Rolf or Dimou." *Id.* ¶ 32.

Shortly thereafter, Abdelbaki sent Ono another email, this time "expressing concerns [about]

his future employment status." Dkt. 10 ¶ 33. Abdelbaki stated that he "wanted to respectfully

disagree that [he had] 'created a mess.'" *Id.* He maintained that he had "done everything to withhold information regarding personal communications with Rolf so that this situation did not escalate" to what it had become. *Id.* He further stated that [t]he only person that [he had] contacted was Misha [Ershov]," and that he only sent him one audio file and mentioned a few things Rolf had said regarding his teaching. *Id.* Last, he stated that he would not "waiver in [his] convictions" that Rolf had harassed him and created a toxic work environment, which had now "reached the point where it was no longer bearable." *Id.*

In response, "Ono was mute" regarding his concerns. Dkt. 10 ¶ 34. He simply stated: "I think we have moved on and are proceeding towards a satisfying conclusion to the semester." *Id.*

The following Summer 2022, Abdelbaki "reapplied for the same adjunct teaching position" that he held previously on numerous occasions, but he was not selected for the job. *Id.* ¶ 35. He alleges that he was not rehired "despite Ershov's tacit provision that [he] would be rehired, without interview, pending satisfactory standing." Id. He alleges that the white, non-Muslim individual hired in his place possessed fewer desirable qualifications than him. *Id.* ¶ 37. The individual "had never taught at UVA" or "a comparative university." *Id.* ¶ 36. Nor did he have the same degree of familiarity with "the financial mathematics course that he was slated to teach in spring 2022," which Abdelbaki had taught several times *Id.* ¶¶ 36, 39. Abdelbaki ultimately surmises that he "was not re-hired by Ono"—despite receiving "nearly perfect marks on course evaluations"—because he "had complained about discrimination from Rolf." *Id.* ¶ 36.

That fall, Abdelbaki was contacted by members of the mathematics department, who stated that "Rolf was being investigated for discriminating against other mathematics employees." Dkt. 10 ¶ 41. In turn Abdelbaki related "his side of the story" to a faculty member who was investigating the matter and served as head of Diversity, Equity, and Inclusion for the

department. *Id.* The investigator told Abdelbaki that Rolf had received "numerous complaints, one of which was from a current mathematics instructor who identified as being transgender." The investigator further stated that "Ono was not 'the type' to alter any administrator's supervisory duties due to misbehavior," including Rolf. *Id.* Abdelbaki alleges that "[b]eginning August 2022, Ono promoted Rolf from associate professor to full professor, despite the numerous complaints of discrimination." *Id.* ¶ 42.

## ANALYSIS

In his complaint, Abdelbaki raises three claims: (1) retaliation in violation of Title VII; (2) race, religion, and national origin discrimination in violation of Title VII; and (3) race discrimination in violation of the Fourteenth Amendment's Equal Protection Clause, pursuant to 42 U.S.C. § 1983. *See* Dkt. 10 at 8–9 (Count I), 9–11 (Count II), 11–12 (Count III). He proceeds against Defendant the Rector & Visitors of UVA, and against each named faculty member "in his individual capacity," Dkt. 10 at 1, seeking damages, specific injunctive relief, and any "further relief in any form that this Court deems just and proper." *Id.* at 13.

### A.  Plaintiff Abdelbaki has Sufficiently Stated a Claim for Retaliation under Title VII

To state a claim for retaliation under Title VII, Abdelbaki must allege: "(i) that he engaged in protected activity; (ii) that [UVA] took adverse action against him; and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). Courts find employees have engaged in protected activity when they either "oppos[e] a practice prohibited under Title VII (pursuant to the opposition clause)" or "mak[e] a charge, testify[], assist[], or participat[e] in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause)." *Pitter v. Cmty. Imaging Partners, Inc.*, 735 F. Supp. 2d 379, 395 (D. Md. 2010); *see also*

*Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). In the Title VII context, the Supreme Court has defined "oppose" as "to resist or antagonize . . . to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as an opinion." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed. 1958). As such, this is not an onerous burden for employees. Rather, "[w]hen an employee communicates to [his] employer a belief that the employer has engaged in . . . employment discrimination, that communication virtually always constitutes . . . *opposition*," and is treated as protected activity for the purposes of Title VII. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (citing *Crawford*, 555 U.S. at 276).

UVA argues that Abdelbaki's claim for retaliation fails as the claim lacks a "casual connection between [the] protected activity and an adverse action based on temporal proximity." Dkt. 27 at 3. The Court disagrees.

Abdelbaki alleges that in "March or April" of 2022, he reported to Ono that "he felt he was being harassed and mistreated by Rolf and Dimou . . . ." Dkt. 10 ¶ 28. As a result of this alleged harassment, Abdelbaki "requested that another instructor teach his two courses for the remaining months of the semester." *Id.* Initially, Ono granted Abdelbaki's request. *Id.* ¶ 29. However, after being "reprimanded" for his decision, Ono called Abdelbaki and told him he had made a "mistake" by relieving him. *Id.* ¶¶ 30-32. During this conversation, Abdelbaki told Ono, "I know that Rolf is harassing me because I'm Muslim," but ultimately agreed to resume teaching his courses via Zoom for the remainder of the semester. *Id.* ¶¶ 31-32.

Taken in the light most favorable to Plaintiff, and given the low threshold required to prove opposition, Abdelbaki has pled sufficient facts to demonstrate that he opposed an unlawful

employment practice, which qualifies as protected activity under Title VII. Abdelbaki has also sufficiently pled that UVA engaged in adverse action, as the loss of an adjunct teaching position and wages "well might" have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 77 (2006).

Once a plaintiff has alleged both protected activity and adverse action, they must allege causation between the events. *Foster*, 787 F.3d at 253. To allege causation, the Fourth Circuit requires "very little evidence of a causal connection;" plaintiffs simply must state facts sufficient that a reasonable fact finder could conclude that but for the protected activity, the adverse action would not have occurred. *See Roberts v. Glenn Indus Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021) (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) (unpublished)); *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.") (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

In the Fourth Circuit, a plaintiff can allege causation in two ways, by either "showing that the adverse act bears sufficient temporal proximity to the protected activity," or by alleging "facts that suggest the adverse action occurred because of the protected activity." *See Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (discussing framework in Rehabilitation Act context). Generally, courts find causation through temporal proximity when very little time passes between the protected activity and the adverse action. *See e.g.*, *Wormuth*, 54 F.4th at 219 (finding gap of two months insufficient to prove temporal proximity and causation); *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (same). However, in the context of a failure to rehire case, long lapses in time, even up to several years, "do not inevitably foreclose a finding of causality" as the failure to reinstate an employee is often an employer's first opportunity to engage in retaliation.

14

*Templeton v. First Tenn. Bank, N.A.*, 424 Fed. Appx. 249, 251 (4th Cir. 2011) (unpublished)

(citing *Dixon v. Gonzales*, 581 F.3d 324, 335 (6th Cir. 2007))

In his complaint, Abdelbaki alleges that Ono made the decision not to rehire him because

he "had complained [to Ono] about discrimination from Rolf, and effectively 'muddied the

waters.'"[3] Dkt. 10 ¶ 36. Although Abdelbaki does not allege the exact date he was informed he

would not be rehired, the record indicates it occurred before the fall 2022 semester began. *Id.* ¶

35. Since the failure to rehire for the fall semester occurred immediately following the semester

when Abdelbaki reported the alleged harassment, the Court does not find the temporal delay fatal

to causation. On the contrary, based on the sequential timing of the report and the failure to

rehire, the Court finds that the adverse act and protected activity bear sufficient temporal

proximity for causation. Abdelbaki has pled sufficient facts for a reasonable fact finder to find

the timing to be consistent with retaliatory motivation as this was UVA's first "opportunity to

[retaliate]." *Steven v. Charles Cty.*, 2022 WL 2362283 *26-27 (D. Md. June 30, 2022) (citing

*Templeton*, 424 Fed. Appx. ("finding at the motion to dismiss stage that where the plaintiff

alleged that she had resigned shortly after complaining of harassment, a causal connection could

plausibly be inferred despite the passage of time because her re-application two years later

presented the first chance for her employer to retaliate").

## B. Abdelbaki Fails to State a Claim of Discrimination Under Title VII

Title VII prohibits employers from "discharg[ing]" or "discriminat[ing] against" an

---

[3]     The Court finds unpersuasive Defendant's argument that allegations in ¶ 36 and page 9 ¶ 5 of the Amended Complaint should be barred for failure to exhaust because the allegations do not correspond with Abdelbaki's EEOC Charge. Dkt. 23 at 5. Defendants argue that in the EEOC charge Abdelbaki claims that he was fired because he had gotten Ono in trouble with higher administrators, where in the Amended Compliant Abdelbaki alleges that he was fired because he reported harassment. *Id.* Ex. 1 at 5; Dkt. 10 at 9 ¶ 5. In the Charge, Abdelbaki checked boxes for discrimination based on race, color, religion, national origin, and retaliation. Dkt. 23 Ex. 1 at 2. To the extent the Amended Complaint differs from the EEOC charge, the Court finds that these discrepancies are still "reasonably related to the original complaint." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2025) (citing *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996).

employee "with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race, . . . religion . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). An employee states a plausible discrimination claim in violation of Title VII when he alleges that, *inter alia*, race, religion or national origin were "a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* § 2000e-2(m).

Title VII claims contain a strict timing requirement; within 300-days of each discrete act of discrimination, an "employee must file a charge of discrimination" with the EEOC. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2024) (citing *AMTRAK v. Morgan*, 536 U.S. 101, 153 (2002)); *see* 42 U.S.C.S. § 2000e-5(e)(1). Once outside the 300-day window, separate discriminatory acts "are not actionable . . . even when they are related to acts alleged in timely filed charges." *AMTRAK*, 536 U.S. at 113 (finding plaintiff could not use timely employment termination to pull in time-barred discriminatory act).

Abdelbaki's relevant employment with UVA began January 2022 and ended May 2022. Dkt. 10 ¶ 39. During this time period, Abdelbaki alleges he faced Title VII discrimination based on his race, religion, and national origin. Dkt. 10 ¶¶ 2-7. However, Abdelbaki fails to allege he raised his discrimination claims with the EEOC within the 300 days required by the law. Even more glaringly, Abdelbaki himself concedes that his Title VII discrimination claims are time-barred due to his failure to file an EEOC charge within 300 days. Dkt. 26 at 14. (stating, "[a]though [his] discrimination claims under Title VII are time-barred . . . [his] failure to rehire [claim] . . . comfortably falls within the 300-day limit). Abdelbaki filed his charge with the EEOC on May 6, 2023, meaning the only actionable discriminatory acts must have occurred "on or after July 10, 2022." *Id.* Therefore, Abdelbaki's allegations pertaining to when he was employed by UVA are time-barred as they occurred before May of 2022. Dkt. 10 ¶ 39.

Accordingly, the Court can only consider whether Abdelbaki sufficiently alleges a timely discrimination claim for failure to rehire. *Id.*

As a part of his discrimination claim, Abdelbaki alleges that UVA "intentionally deprived Plaintiff of equal employment opportunities, and otherwise adversely affected his status[] as an employee." Dkt. 10 at 10 ¶ 8. Defendants argue that this allegation is insufficient to state a cause of action for discrimination through failure to rehire. The Court disagrees. Abdelbaki is proceeding *pro se*, so the Court liberally construes this allegation as a failure to hire cause of action and will analyze it accordingly.

In order to state a claim for discriminatory failure to hire under Title VII, Abdelbaki must allege that: "(1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected for the position under circumstances giving rise to an inference of unlawful discrimination." *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998). To survive a 12(b)(6) motion to dismiss a plaintiff must set forth "facts sufficient to allege each element of his claim." *Shomo v. Apple, Inc.*, 2015 WL 777620, at *4 (W.D. Va. Feb. 2, 2105) (citing *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003)). As such, Abdelbaki must allege facts raising a plausible claim that he was not hired because of his race, religion, or national origin. The Court finds that he has not alleged such facts.

First, Abdelbaki is a Muslim, "Arab/Middle Eastern man" of African descent and therefore a member of a protected group. Dkt. 10 ¶ 7. Second, neither party disputes that in the Summer of 2022 Abdelbaki reapplied for the same adjunct teaching position he previously held. *Id.* ¶ 35. Third, the Court finds that Abdelbaki was qualified for the position, as he had previously been employed by UVA, serving in the same or similar position from August 2014 to

17

May 2017 and again from January 2022 to May 2022. *Id.* ¶ 12-14.  It is upon the final element

that the Court finds Abdelbaki has failed to state his claim.

Abdelbaki's failure to rehire claim is based on two conclusory allegations: (i) Ono knew

Abdelbaki's race, religion, and national origin; and that (ii) a "similarly situated Caucasian

white, non-Muslim" who possessed "fewer desirable qualifications" was hired instead of

Abdelbaki. Dkt. 10 ¶ 37. Abdelbaki alleges the new hire never previously taught at UVA or a

comparative university and that the new hire lacked familiarity with "the financial mathematics

course that he was slated to teach." *Id.* ¶ 39. Despite these allegations, Abdelbaki concedes that

both he and the new hire possessed doctoral degrees and that the bulk of their prior teaching jobs

were at community colleges. *Id.* at 37. These facts, taken individually and collectively, do not

support a plausible claim that Abdelbaki was not rehired because of his race or religion. *See Ali*

*v. BC Architects Eng'rs, PLC*, 83s Fed. Appx 167 (4th Cir. 2020) (finding that "[s]tanding

alone," allegations that plaintiff "applied for the position of structural engineer, that she was

qualified for the position, and that someone of a different race was selected for the position" are

"insufficient to support a plausible race-discrimination claim"); *see also McCleary-Evans v Md.*

*Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (noting that

discrimination cannot be presumed simply because one candidate was selected over another

candidate of a different race).

Further damaging to Abdelbaki's discrimination claim is that he specifically alleges a

nonracial reason for his failure to be rehired in his EEOC complaint. Abdelbaki asserts that he

was not rehired "clearly since Ono was upset that [he] had gotten him 'in trouble' with higher

administrators at the University." Dkt. 23-1 at 6. Without Abdelbaki raising more specific

allegations of discriminatory intent, the fact that a similarly experienced, white individual was

hired instead of Abdelbaki does not "giv[e] rise to an inference of unlawful discrimination." *Brown*, 159 F.3d at 902. Indeed, "[t]he mere fact that a certain action is potentially consistent with discrimination does not alone support a reasonable inference that the action was motivated by bias." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020). As such, Plaintiff has failed to plead sufficient facts for his Title VII claim to survive a motion to dismiss.

### C. Abdelbaki Fails to State a Fourteenth Amendment Race Discrimination Claim under § 1983

Section 1983 discrimination claims and Title VII discrimination claims share the same standard. *Love-Lane v. Martin*, 355 f.3d 766, 786 (4th Cir. 2004) (explaining that the "*McDonnell Douglas* framework, developed for Title VII, has been used to evaluate racial discrimination claims under [Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983]); *see also McCray v. Pee Dee Reg'l Transp. Auth.*, 263 Fed. Appx. 301, 305 (4th Cir. 2008) (explaining that the elements of a § 1983 claim of discrimination pursuant to the Equal Protection Clause of the Fourteenth Amendment mirror those of a Title VII discrimination claim). Accordingly, absent direct evidence, in order to state a claim of race discrimination under § 1983, a plaintiff must prove: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class, or there is some other evidence giving rise to an inference of unlawful discrimination." *Johnson v. Lexington Cty. Sch. Dist. Two*, 2018 WL 1466062 *16 (D.S.C. March 26, 2018) (citing *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010).

Abdelbaki's § 1983 race discrimination claim faces the same fate as his Title VII discrimination claim. As discussed above, Abdelbaki has failed to allege sufficient facts that he was not rehired due to his race. Abdelbaki's § 1983 race discrimination claim is based on similar conclusory allegations that Defendants: (i) made employment-based decisions based on

Abdelbaki's race; (ii) gave preferential treatment to employees who were white; (iii) deprived him of the same terms and conditions of employment available to other employees who were white; and (iv) denied him the opportunity to work in an environment free from unlawful discrimination and racial hostility. Dkt. 10 at 11-12. Abdelbaki has once again failed to sufficiently plead more than mere conclusory allegations that Abdelbaki's failure to be rehired was due to his race, or that Defendants unlawfully discriminated against him on the basis of his race. As such, Abdelbaki's § 1983 race discrimination claim cannot survive the motion to dismiss.[4]

Finally, Abdelbaki's requests for injunctive relief under Count III against Ono, Rolf, and Dimou in their individual capacities. Injunctive relief cannot be awarded against government officials sued in their individual capacities, as such, Abdelbaki's request for injunctive relief is dismissed. *See Kirby v. Cty. Of Elizabeth*, 388 F.3d 440, 452 n.10 (4th Cir. 2004).

## CONCLUSION

For the reasons stated above, Abdelbaki's objections to the R&R are overruled, the R&R is adopted, and Abdelbaki's motion for leave to file is **DENIED**. The Defendants' motion to dismiss is **DENIED** as to Count I and **GRANTED** as to Counts II and III.

The Clerk of Court is directed to send a copy of this memorandum opinion and order to Plaintiff and all counsel of record.

Entered this 29th   day of September, 2025.

---

[4] To the extend Defendants additionally argue that Abdelbaki's § 1983 claim fails due to qualified immunity, the court need not address this because Abdelbaki has not pled sufficient facts to establish his race discrimination claim under § 1983.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE